UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

**WELLS FARGO BANK, N.A.,**
**as Trustee,**

        Plaintiff,

                Case No. 09-CV-768

-vs-

**LAKE OF THE TORCHES ECONOMIC**
**DEVELOPMENT CORPORATION,**

        Defendant.

---

## DECISION AND ORDER

This matter was filed on December 21, 2009 and assigned to the Honorable Barbara Crabb, Chief United States District Judge for the Western District of Wisconsin. The plaintiff, Wells Fargo Bank, N.A. ("Wells Fargo"), alleged that the defendant, Lake of the Torches Economic Development Corporation ("Lake of the Torches EDC," or the "Corporation"), breached a Trust Indenture agreement, creating a "very real danger that Lake of the Torches EDC will refuse to pay interest or principal on the $46,615,000 principal amount of bonds that it has issued." Wells Fargo also filed an expedited motion for the appointment of a receiver.

On January 5, Judge Crabb recused herself, and the case was transferred to the undersigned for further proceedings. On January 6, the Court issued an order dismissing the case. The Court found that the "Trust Indenture is a management contract that was executed without prior approval from the National Indian Gaming Commission. Without prior

approval, the entire contract is void *ab initio*" (internal citations omitted).  The Court indicated that a written opinion would follow, which is issued herein.

## BACKGROUND

Wells Fargo is a national banking association with trust powers, with its principal place of business in Sioux Falls, South Dakota.  Well Fargo's Corporate Trust Division has its principal place of business in Minneapolis, Minnesota.  The Lake of the Torches EDC is a corporation chartered by the Lac du Flambeau Band of Lake Superior Chippewa Indians (the Tribe).

Lake of the Torches EDC is a single purpose, wholly-owned entity of the Tribe, established under tribal law in Wisconsin to own and operate the Lake of the Torches Resort Casino (the "Casino Facility").  Several years ago, the Tribe sought to expand its revenue base by participating in a project to build a riverboat casino, hotel and bed-and-breakfast in Natchez, Mississippi called the Grand Soleil Project.  In order to refinance and consolidate certain Lake of the Torches EDC debt associated with the operation of the Casino Facility, and also to fund participation in the Grand Soleil Project, the Corporation issued bonds and entered into a Trust Indenture with Wells Fargo on January 1, 2008.  Saybrook Capital LLC ("Saybrook") is the sole holder of Lake of the Torches EDC bonds under the Trust Indenture.

Unfortunately, the Grand Soleil Project has been plagued by problems since it began and is still not operational.  The Tribe struggled to make bond payments and was forced to reduce or eliminate many programs that are important to the health and welfare of the Tribal members.  The failure of the Grand Soleil Project to materialize exacerbated the economic

stress caused by the Bonds. The expected revenue from the project was intended to fund repayment of the Bonds.

Under the Trust Indenture, the Trustee (Wells Fargo) has an obligation in the event of default or breach to "enforce[] . . . its rights and the rights of the Bondholders as due diligence, prudence and care would require and to pursue the same with like diligence, prudence and care." The Trust Indenture was intended to give the Trustee oversight of Lake of the Torches EDC funds relating to its Casino Facility operations.

The Trust Indenture requires mandatory daily deposits of Lake of the Torches EDC funds relating to its Casino Facility operations. Section 5.01 of the Trust Indenture requires that all gross revenues from the Casino Facility be deposited, on a daily basis, into a designated trust fund: "The Corporation shall make daily deposits of Gross Revenues . . . into the Revenue Fund or a Deposit Account controlled by the Trustee from which transfers will be made into the Revenue Fund upon order of the Trustee." Lake of the Torches EDC may only draw funds from the Operating Account to pay for Lake of the Torches EDC operating expenses: "Funds on deposit in the Operating Reserve Account may be withdrawn by the Corporation upon written certification from the Authorized Representative that the funds being withdrawn are needed and will be used by the Corporation to pay Operating Expenses of the Corporation."

On November 30, 2009, Tribe Treasurer Barry LeSieur and Tribe Vice President Dee Mayo, acting on behalf of the Lake of the Torches EDC, requested that $4,750,000 be transferred from the Lake of the Torches EDC Operating Reserve Account to the Lake of the

Torches EDC Master Account at Chippewa Valley Bank. LeSieur and Mayo certified that the purpose of the transfer was to pay operating expenses of Lake of the Torches EDC. The funds were transferred pursuant to that request on December 1, 2009.

On December 7, 2009, Saybrook sent a letter to the Lake of the Torches EDC and the Tribe questioning the necessity of the transfer of funds for operating expenses and advising of Saybrook's request to the Trustee to demand documentation and evaluate the legitimacy of the transfer of funds. On December 8, December 9, and December 11, the Trustee made further requests for documentation as required by Sections 6.06 and 6.07 of the Trust Indenture. The Trustee alleges that Lake of the Torches EDC did not provide a substantive response to these demands and did not produce the documents required by these sections of the contract.

Section 8.01(c) of the Trust Indenture provides that a failure to "observe or perform, in any material respect, any covenant, condition, agreement or provision" of the Indenture Agreement (including Sections 5.01, 6.06 and 6.07) constitutes an Event of Default. Section 8.02 provides that upon the occurrence of an Event of Default, the Trustee may "by notice in writing delivered to the Corporation declare the principal of all Bonds hereby secured then outstanding and the interest accrued thereon immediately due and payable, and such principal and interest shall thereupon become and be immediately due and payable . . ." Furthermore, the Trustee is entitled to the appointment of a receiver pursuant to Section 8.04.

On December 18, 2009, Saybrook requested the Trustee to declare the principal and interest of all bonds due immediately based on multiple Events of Default. The Trustee in

-4-

turn notified the Lake of the Torches EDC that the principal and interest of all bonds are due immediately. On December 21, the Trustee brought the instant lawsuit, alleging four claims for breach of the Trust Indenture: (1) Failure to Deposit Daily all Gross Revenues; (2) Use of Funds for Unauthorized Purpose; (3) Failure to Provide Records for Inspection; and (4) Failure to Provide Financial Statements.

## ANALYSIS

In 1988, Congress passed the Indian Gaming Regulation Act ("IGRA"). The IGRA establishes "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). The IGRA was also enacted to "shield [Indian tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(2). The IGRA effects these goals in part by providing for federal oversight of contracts between tribes and non-tribal entities for the management of tribal gaming operations. Tribes may enter into contracts for the management of gaming operations only with the approval of the National Indian Gaming Commission ("NIGC") Chairman. *See* 25 U.S.C. § 2711(a)(1); 25 U.S.C. § 2710(d)(9). Unapproved management contracts are void. *See* 25 C.F.R. § 533.7; *First Am. Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1176 (10th Cir. 2005) ("Lacking the formality of NIGC approval, an agreement to manage does not become a contract: it is void"). It is undisputed that the Trust Indenture was not approved by the

NIGC. Therefore, if the Court determines that the contract is a management contract, the contract is void.

The IGRA regulations define "management contract" as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. The regulations also define "primary management official" as any person who has authority to "set up working policy for the gaming operation." 25 C.F.R. § 502.19(b)(2). Accordingly, the regulations demonstrate that a "necessary condition for a management contract is that it grant to a party other than the tribe some authority with regard to a gaming operation." *Machal, Inc. v. Jena Band of Choctaw Indians*, 387 F. Supp. 2d 659, 665 (W.D. La. 2005) (citing *First Am. Kickapoo*).

The security provided for the Bonds was the existing Casino Facility in Lac du Flambeau. The Corporation pledged "[a]ll right, title and interest in and to the Gross Revenues of the Corporation, and investment earnings on the Gross Revenues of the Corporation." Trust Indenture at 2, Granting Clause I. The Gross Revenues of the Corporation include all receipts from the operation of the Casino Facility. *Id.* § 1.01. The Corporation also pledged the Casino's equipment and "[a]ll right, title, and interest in and to the Corporation's accounts, deposit accounts, general intangibles, chattel paper, instruments and investment property and the proceeds of each of the foregoing and all books, records and files relating to all or any portion of the Pledged Revenues." *Id.* at 2, Granting Clause II.

The Trust Indenture provides that the Corporation cannot "incur capital expenditures that exceed 25% of the prior fiscal year's capital expenditures without receiving the written consent of [at least 51% of the bondholders], which consent will not be unreasonably withheld." *Id.* at § 6.18. It provides for the appointment of a "Management Consultant" at the direction of a majority of the bondholders if the "Debt Service Ratio" falls below a certain level. *Id.* at § 6.19.[1] It further provides that the Corporation will not "replace or remove and will not permit the replacement or removal of the [Casino's] General Manager, Controller, or Chairman or Executive Director of the Gaming Commission for any reason without first obtaining the prior written consent of 51% of the [bondholders]." Trust Indenture, § 6.20. All of these provisions give the bondholders the opportunity to exert significant control over the management operations of the Casino Facility. *See* Affidavit of Kevin Washburn,[2] ¶ 8; *First Am. Kickapoo*, 412 F.3d at 1173 (provision to "supervise, train and instruct" Casino employees allowed contractor to set up working policy for the Casino); 25 C.F.R. § 531.1(b)(4) (hiring, firing, training and promoting employees); 25 C.F.R. § 531.1(b)(1) (maintenance and improvement of gaming facility).

The Trust Indenture contains additional terms that give the bondholders management control when the Corporation defaults. In the case of a specified "Event of Default," the

---

[1] "Such independent management consultant shall conduct a review and provide a report . . . which make recommendations as to improving the operations and cash flow of the Casino Facility. The Corporation agrees to use its best efforts to implement the recommendations of the management consultant within ninety (90) days . . ."

[2] Kevin Washburn is a former General Counsel for the NIGC and is currently the Dean of the University of New Mexico School of Law. Dean Washburn reviewed the Trust Indenture and opined that "if the NIGC had been given an opportunity to review the Trust Indenture, it would very likely have found that the indenture as written constitutes a management contract, and it would have asserted jurisdiction over the agreement." Affidavit, ¶ 7.

-7-

majority of the bondholders "shall have the right to require, in writing, the Corporation to hire new management and shall have the right to consent, in writing, to the management personnel and/or company that the Corporation recommends as replacement management." Trust Indenture, § 8.02. An Event of Default also triggers the Trustee's right to the appointment of a receiver "of the Trust Estate and of the revenues, issues, payments and profits thereof . . . with such powers as the court making such appointment shall confer." *Id.*, § 8.04. The "Trust Estate" includes the assets pledged by the Corporation to secure the bonds – all revenues, equipment, and accounts of the Casino Facility. Wells Fargo argues that a receiver would not exercise oversight over the management of the Casino Facility, but would only ensure that the Corporation deposited its revenues and paid its liabilities. By forcing the Corporation to deposit its revenues and pay its liabilities, the receiver would in fact be exerting a form of managerial control since those monies could not be used for other purposes related to the operation of the Casino Facility. "The terms of the indenture seem to presuppose substantial control by a receiver over key financial decisions. These are among the most important decisions in managing a gaming operation and, because they involve large sums of money, are among the management decisions of greatest interest to NIGC regulators." Washburn Aff., ¶ 9.

Taken collectively and individually, these terms in the Trust Indenture give unapproved third parties the authority to set up working policy for the Casino Facility's gaming operation. Even though many of the provisions are contingent, "the regulations' definition of a management contract as an agreement that provides for the management of

-8-

'all or part' of a gaming operation suggests a definition of management that is partial rather than absolute, contingent rather than comprehensive." *First Am. Kickapoo* at 1175. The Court has no choice but to conclude that the Trust Indenture is a "management contract." *See, e.g., United States ex. rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 424-25 (8th Cir. 2002) (series of agreements that gave the contractor "a percentage ownership interest in the Tribe's indebtedness" and "mandated the Tribe's compliance" with the contractor's recommendations was a management contract); *Machal*, 387 F. Supp. 2d at 667-70 (finding a series of agreements to be management contracts).

The Court's finding that the Trust Indenture is an unapproved management contract destroys the Court's jurisdiction over the defendant. In the absence of a clear waiver, suits against tribes (and tribal corporations) are barred by sovereign immunity. *See Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 812 (7th Cir. 1993) (citing *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505 (1991)); *Kiowa Tribe of Oklahoma v. Mfg. Tech., Inc.*, 523 U.S. 751, 753 (1998). The Trust Indenture contains a waiver provision, whereby the Corporation "expressly waives its sovereign immunity" in relation to "a suit to enforce the obligations of the Corporation under the Indenture, the Bond Resolution, the Security Agreement, or Bond Purchase Agreement." Trust Indenture, § 13.02. However, the entire contract is void *ab initio*, so the waiver in the Trust Indenture is also invalid. *See A.K. Mgt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 789 (9th Cir. 1986) ("the waiver of sovereign immunity is clearly made part of the Agreement, and is not operable except as part of that Agreement. *Since the entire contract is inoperable*

-9-

*without BIA approval, the waiver is inoperable and, therefore, the tribe remains immune from suit*") (emphasis added).

Wells Fargo argues that the waiver provision is separable from the unenforceable provisions of the Trust Indenture. *See* Trust Indenture, § 14.04 (Separability of Indenture Provisions). As an initial matter, the Court agrees with the Tenth Circuit's observation that it "may be questioned whether any part of a contract determined to be void ab initio, including the severability provisions, may be enforced." *First Am. Kickapoo*, 412 F.3d at 1178 n.5. In any event, the argument is a non-starter. Even if the waiver provision could be saved, the remainder of the Trust Indenture is void, so there would be no remaining obligations to enforce under the contract.[3]

Wells Fargo argues that only the NIGC Chairman may determine whether a contract is void under the IGRA. This argument misapprehends the nature of the administrative scheme and the consequences which flow from the failure to gain approval of a purported management contract. Wells Fargo brought this action to enforce the Trust Indenture and sought immediate appointment of a receiver, thus bringing the issue of the validity of the contract squarely before the Court. If a contract with an Indian tribe is a management contract, then the Court has no choice but to find such a contract void if it was not approved by the Chairman. *See* 25 C.F.R. § 533.7. "The regulations' requirement that management

---

[3] Wells Fargo did not argue that the illegal management provisions could be severed from the remainder of the Trust Indenture. The "rule of severability" provides that a contract may survive if an illegal clause can be severed from the remainder of the contract without defeating the primary purpose of the bargain. *See Dawson v. Goldammer*, 722 N.W.2d 106, 110 (Ct. App. 2006). Because many of the "Event of Default" provisions are illegal, the contract cannot be severed. *See First Am. Kickapoo* at 1178 (declining to sever provisions when the entire contract is meant to be a "package deal").

contracts be approved to be valid creates no ontological mystery whereby a contracts springs fully-fashioned from nothingness, but rather identifies a formality necessary before an agreement to manage a tribal gaming operation can become a contract to so manage." *First Am. Kickapoo* at 1176.

In *United States ex rel. St. Regis Mohawk Tribe v. President R.C. - St. Regis Mgt. Co.*, 451 F.3d 44 (2d Cir. 2006), the Second Circuit dismissed a Tribe's request for a declaratory judgment that an unapproved management contract was void. The court dismissed because the Tribe failed to exhaust their administrative remedies. "By proceeding directly to the district court in an action nowhere authorized under IGRA, the Tribe impermissibly sought a determination outside the administrative review scheme drafted by Congress." *Id.* at 51. *St. Regis* is inapposite because it arose in a completely different procedural posture. In the instant case, Wells Fargo seeks to *enforce* a management contract, but the Court cannot give effect to such a contract in the absence of prior approval from the NIGC Chairman. In other words, the Court may determine whether a contract is a management contract when the issue becomes ripe for adjudication. *See Casino Magic Corp.*, 293 F.3d at 424-26; *First Am. Kickapoo* at 1172-75.

Similarly, Wells Fargo argues that the Corporation should be estopped from arguing the invalidity of the Trust Indenture because the Corporation failed to exhaust its administrative remedies. This argument ignores the Tribe's pursuit of an NIGC opinion as part of an ongoing effort to renegotiate the Bond payments with the Trustee, an effort that predates this litigation. *See* Declaration of William Beson, ¶¶ 12-14. Moreover, Wells

-11-

Fargo's purported reliance upon the Tribe's initial failure to pursue an NIGC opinion was completely unreasonable. *See Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002) (equitable estoppel requires reasonable reliance). Given the size of the transaction and the complicated nature of the regulatory scheme, it is a bit surprising that Wells Fargo did not insist upon NIGC review and approval. "Because the regulatory landscape appears uncertain to the untrained observer and because transactional attorneys seek to minimize risk and uncertainty, it is common for parties to obtain NIGC review of transactional documents for the finance of Indian gaming operations, even when the parties assert that the financing arrangement does not constitute a management contract." Washburn Aff., ¶ 6; *see also In re SRC Holding Corp.*, 352 B.R. 103, 176 (Bkrtcy. D. Minn. 2006).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** this case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 11th day of January, 2010.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**