UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

**WELLS FARGO BANK, N.A.,**
**as Trustee,**

                Plaintiff,

                                                  **Case No. 09-CV-768**

      **-vs-**

**LAKE OF THE TORCHES ECONOMIC**
**DEVELOPMENT CORPORATION,**

                Defendant.

## DECISION AND ORDER

In December 2009, the plaintiff, Wells Fargo Bank, N.A. ("Wells Fargo"), brought this action to enforce a Trust Indenture agreement against Lake of the Torches Economic Development Corporation ("Lake of the Torches EDC" or the "Corporation"), a corporation chartered by the Lac du Flambeau Band of Lake Superior Chippewa Indians. The Trust Indenture was designed to secure repayment of the principal and interest on $50 million in bonds issued by the Corporation. On January 6, the Court found the Trust Indenture to be a management contract executed without prior approval from the National Indian Gaming Commission ("NIGC"). *See* 25 U.S.C. § 2711(a)(1); 25 C.F.R. § 533.7. This rendered the contract, and the waiver of sovereign immunity contained therein, void under the Indian Gaming Regulation Act ("IGRA"). Therefore, the Court dismissed the case because it lacked jurisdiction over the defendant.

Now before the Court are the plaintiff's motions to alter or amend the judgment and for leave to file an amended complaint. For the reasons that follow, these motions are denied.

## I.  Procedural Background

This action was filed on December 21 and assigned to the Honorable Barbara Crabb, Chief Judge of the Western District of Wisconsin. Wells Fargo alleged four claims under the Trust Indenture: (1) Breach of Contract – Failure to Deposit Daily All Gross Revenues (Section 5.01 of the Trust Indenture); (2) Breach of Contract – Use of Funds for Unauthorized Purpose (Section 5.01); (3) Breach of Contract – Failure to Provide Records for Inspection (Section 6.06); (4) Breach of Contract – Failure to Provide Financial Statements (Section 6.07). On the same day, Wells Fargo separately moved for the appointment of a receiver pursuant to Sections 8.04 and 8.03 of the Trust Indenture. Wells Fargo requested "expedited disposition" on its motion for a receiver.

On December 28, Judge Crabb issued an order stating that from the "materials submitted by plaintiff in support of its motion, it appears that appointment of a temporary receiver is warranted." D. 8 at 1. Judge Crabb reserved a final decision on the motion until she could hold an expedited hearing by telephone. Wells Fargo noticed the hearing for December 29.

Also on December 28, the Corporation filed a notice of appearance and a brief in opposition to Wells Fargo's motion to appoint a receiver. The Corporation argued that the "contracts upon which the Trustee's request is based are void and unenforceable as

-2-

unapproved management contracts, rendering the purported waiver of sovereign immunity contained in those contracts also void. Thus, the Court lacks jurisdiction over this case." D. 12.

At the December 29 hearing, the parties agreed to maintain the status quo until a hearing on Wednesday, January 6. D. 17, 20. However, on January 5, Judge Crabb recused herself, and the case was transferred to the undersigned for further proceedings.

Also on January 5, the parties filed supplemental briefs pursuant to Judge Crabb's order. D. 17. In this round of briefing, the Corporation continued to develop its argument that the Trust Indenture was a management contract. In support, the Corporation provided an affidavit from Kevin Washburn, Dean of the University of New Mexico School of Law and former General Counsel of the NIGC. Dean Washburn opined that "if the NIGC had been given an opportunity to review the Trust Indenture, it would very likely have found that the indenture as written constitutes a management contract, and it would have asserted jurisdiction over the agreement." D. 32, ¶ 7.

Later in the day on January 5, the Court issued an order canceling the January 6 hearing in Madison and scheduling a telephonic status conference for January 6 at 2 p.m.. The Court advised that the "parties should be prepared to discuss whether the status quo agreement can be extended for a period of time while the Court reviews the materials and considers the merits of the pending motion." D. 38. Before that hearing took place, the Court canceled the hearing and issued an order of dismissal. The Court issued a written

opinion on January 11. *Wells Fargo Bank N.A. v. Lake of the Torches Economic Dev't Corp.*, — F. Supp. 2d —, 2010 WL 62638 (E.D. Wis.)

## II.     Motion to Alter or Amend[1]

Rule 59(e) motions generally cannot be used to introduce new evidence or advance arguments that could or should have been presented to the district court prior to judgment. *Moro v. Shell Oil Co.*, 51 F.3d 746, 876 (7th Cir. 1996). The purpose of the rule is to "allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986). Rule 59(e) is not a vehicle for a party to "complete presenting his case after the court has ruled against him." *Alloc, Inc. v. Pergo, Inc.*, 572 F. Supp. 2d 1024, 1027 (E.D. Wis. 2008). When a movant uses Rule 59(e) to "reargue the merits of their case," the motion should be denied. *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995).

To prevail on a Rule 59(e) motion, the movant must present either newly discovered evidence or establish a manifest error of law or fact. *LB Credit* at 1267. "Manifest error" does not equate to the disappointment of the losing party. *Oto v. Metro Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). Instead, a manifest error is the "wholesale disregard, misapplication, or failure to recognize controlling precedent on the part of the court." *Id.* "There is no precise definition in the law for what constitutes 'clear error,' though it's clear that any analysis of clear error should conform to a very exacting standard. . . . [T]he moving

---

[1] Rule 59(e) motions are timely if filed no later than 28 days after the entry of judgment. The Clerk for the Eastern District entered judgment on January 11, but the Clerk for the Western District entered a corrected judgment on January 19. Therefore, Wells Fargo's February 8 motion to alter or amend is timely.

party must demonstrate that errors were made which were so egregious that an appellate court could not affirm the district court's judgment." *Kelly v. City of Fort Thomas, Kentucky*, 610 F. Supp. 2d 759, 781 (E.D. Ky. 2009).

Wells Fargo argues that the Court committed clear legal error when it found that the Trust Indenture was a management contract. The Court will not revisit its basic management contract analysis. Suffice it to say that Wells Fargo points to no controlling precedent which demonstrates that the Court committed manifest legal error.

Wells Fargo also argues that the Court committed clear legal error when it found that the management provisions could not be severed, even though the parties did not brief the issue. The Court discussed severance in the context of the immunity waiver in the Trust Indenture. The Court endorsed the Tenth Circuit's observation that it "may be questioned whether any part of a contract determined to be void ab initio, including the severability provisions, may be enforced." *First Am. Kickapoo Op. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1178 n.5 (10th Cir. 2005). The Court then found that "even if the waiver [of immunity] provision could be saved, *the remainder of the Trust Indenture is void*, so there would be no remaining obligations to enforce under the contract." *Wells Fargo* at *5 (emphasis added). The same rationale applies to any attempt to sever the illegal management provisions. The entire contract is void, so there is nothing left to enforce.

In fact, even if traditional severance principles apply here, the management provisions cannot be severed without defeating the primary purpose of the bargain. *Dawson v.*

-5-

*Goldammer*, 722 N.W.2d 106, 110 (Ct. App. 2006).[2] Wells Fargo argues that the management provisions can be severed because the parties did not intend the Trust Indenture to be a management contract in the first instance. However, as Wells Fargo repeatedly emphasizes, the primary purpose of the Trust Indenture is to secure repayment of the Bonds. In the case of certain specified "Events of Default" (some of which form the basis for Wells Fargo's causes of action), the Trustee is granted certain rights to secure repayment (including the appointment of a receiver). The Court already held that these "Event of Default" provisions are illegal management provisions. *Wells Fargo* at *4. If the Court excised these provisions, the primary purpose of the Trust Indenture – securing repayment of the Bonds – would be destroyed. *Id.* at *5 n.3 ("Because many of the 'Event of Default' provisions are illegal, the contract cannot be severed").

Wells Fargo also argues that the Court ruled prematurely because the jurisdictional issue – whether the Corporation waived their sovereign immunity – is intertwined with a merits issue – whether the Trust Indenture is a management contract. Accordingly, Wells Fargo argues that when the Court dismissed this case, it essentially granted the Corporation's unfiled motion for summary judgment on the management contract issue without allowing Wells Fargo the opportunity to present evidence in response to the motion. Wells Fargo particularly objects to the Court's use of, and reliance upon, the affidavit of Kevin Washburn in making its management contract ruling. When "jurisdictional issues and substantive

---

[2] All of the relevant transaction documents include Wisconsin choice of law provisions. Trust Indenture, Section 13.01.

issues are so intertwined that the issue of jurisdiction is dependent on resolution of factual issues going to the merits, the determination of jurisdiction should await the determination of relevant facts on either a motion on the merits or at trial." *Weidner Comm'n, Inc. v. H.R.H. Prince Bandar Al Faisal*, 859 F.2d 1302, 1310 n. 11 (7th Cir. 1988) (citing *Augustine v. United States*, 704 F.2d 1074 (9th Cir. 1983)).

Procedurally, the Court's *sua sponte* dismissal was unconventional, but it does not follow that the Court committed manifest legal error. The Court made a legal ruling based upon undisputed facts, and the Washburn Affidavit was merely persuasive legal authority that the Trust Indenture, as a matter of law, was a management contract.[3] The management contract issue, and by extension the sovereign immunity issue, was the primary issue before the Court, and it was raised as a defense in the very first set of motion papers filed by the Corporation. Even though the Corporation did not move for dismissal, Wells Fargo had a fair opportunity to be heard on this issue. There is no legal authority to suggest that the Court must hold further hearings and entertain more briefing *ad infinitum* when the Court has enough information to make a ruling as a matter of law. Moreover, even if the analogy to a summary judgment ruling is appropriate, summary judgment was warranted because the relevant facts are not in dispute and the Corporation is entitled to judgment as a matter of law. *Augustine*, 704 F.2d at 1079.

Wells Fargo also cites *Health Cost Controls v. Skinner*, 44 F.3d 535 (7th Cir. 1995), where the court reversed a *sua sponte* dismissal for lack of subject matter jurisdiction when

---

[3] Wells Fargo now submits two expert opinions in support of its position that the Trust Indenture is not a management contract. D. 51, D. 53. Neither opinion persuades the Court to reconsider its initial ruling.

-7-

the plaintiff failed to state a claim under a federal statute. The *Skinner* court held that if a plaintiff "fails to properly allege a claim for relief brought under a federal statute, the case should be dismissed under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1)." *Id.* at 537. For many reasons, the comparison to *Skinner* is inapt. Wells Fargo was not bringing a claim under a federal statute, and the Court did not determine that Wells Fargo failed to state a claim upon which relief could be granted. Moreover, a dismissal for failure to state a claim under federal law implicates subject matter jurisdiction under 28 U.S.C. § 1331. By contrast, sovereign immunity is a "jurisdictional bar with a 'hybrid nature,' similar in some respects to personal jurisdiction and to subject matter jurisdiction in others, it is on all fours with neither." *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 50 (1st Cir. 2003); *see also Blagojevich v. Gates*, 519 F.3d 370, 371 (7th Cir. 2008). Whether sovereign immunity is more akin to subject matter jurisdiction or personal jurisdiction is not entirely relevant in this context. What matters is that the Corporation did not waive its sovereign immunity, so summary dismissal was appropriate. *See Enahoro v. Abubakar*, 408 F.3d 877, 880 (7th Cir. 2005) ("sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits. . . .")

The Court understands that its ruling was sudden and surprising, especially in light of the prior proceedings before Judge Crabb, her unexpected recusal, and the confusion involved with the case being transferred to Milwaukee. However, the management contract issue was brought squarely and immediately before the Court in the context of Wells Fargo's

emergency request to appoint a receiver. Without a valid waiver of immunity, there was no jurisdiction over the Corporation, and the case could not proceed.

**III.    Leave to file amended complaint**

Under Rule 15(a), leave to amend should be freely granted, but can be denied when the amendment would be futile. *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008). In the post-judgment context, a party seeking leave to amend must have the judgment reopened pursuant to Rule 59(e) or Rule 60(b) and then request leave to amend. *Amendola v. Bayer*, 907 F.2d 760, 765 n.4 (7th Cir. 1990); *Paganis v. Blonstein*, 3 F.3d 1067, 1072 (7th Cir. 1993); *Dierson v. Chicago Car Exch.*, 110 F.3d 481, 488 (7th Cir. 1997). Wells Fargo argues that it was manifest legal error to dismiss this case without granting leave to amend, particularly when the dismissal was on jurisdictional grounds. *See Frey v. E.P.A.*, 270 F.3d 1129, 1132 (7th Cir. 2001). In light of the unique procedural history of this case, the Court will presume that dismissal without leave to amend was in error and proceed to analyze the proposed amended complaint.

The amended complaint expands the allegations of the original complaint and incorporates not just the Trust Indenture, but all of the related documents generated by the Bond transaction: the Bonds (Exhibit B); a Limited Offering Memorandum ("Offering Memo") (Exhibit C); the Closing Certificate and Bond Resolution (Exhibit D); and two Opinion Letters from tribe and Corporation counsel (Exhibits E and F). In addition to the

first four claims from the original complaint under the Trust Indenture, the amended complaint includes a claim under the Bonds.[4]

Wells Fargo argues that the Bonds are not void because they are "collateral agreements" with respect to the Trust Indenture. IGRA regulations define collateral agreement as "any contract . . . that is related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between the tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or any person related to a management contractor or subcontractor)." 25 C.F.R. § 502.5. The regulations define management contract as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. The statute provides that a management contract for the operation and management of a class II gaming activity "shall be considered to include all collateral agreements to such contract that relate to the gaming activity." 25 U.S.C. § 2711(a)(3).

Contrary to Wells Fargo's argument, there is authority for the proposition that the Bonds are void merely *because* they are collateral to an unapproved management contract (the Trust Indenture). *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Kean-*

---

[4] Just like the Trust Indenture, the Bonds include provisions purporting to waive the Corporation's sovereign immunity. "The [Corporation] hereby expressly waives its sovereign immunity from suit . . . should an action be commenced on this Bond, the Indenture, the Security Agreement, or the Bond Resolution, or regarding the subject matter of the Indenture. . . . The [Corporation] expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin . . . for the adjudication of any dispute or controversy arising out of this Bond, the Indenture, or the Bond Resolution . . . or to any transaction in connection therewith . . ."

*Argovits Resorts*, 249 F. Supp. 2d 901, 903-04, 907 (W.D. Mich. 2003) (vacated and remanded on other grounds). This approach was implicitly followed by the Eighth Circuit in *United States v. Casino Magic Corp.*, 293 F.3d 419 (8th Cir. 2002), where the court held that a series of agreements were void as unapproved management contracts, even though one of those agreements, standing alone, was not a management contract. "A management contract includes the principal contract and 'all collateral agreements to such contract that relate to the gaming activity.' The three agreements discussed above served as a management contract implicitly if not explicitly." *Id.* at 425 (internal citation omitted).

On the other hand, one district court held that an "agreement's being collateral to a management contract is not a sufficient condition for it to be void. . . . [O]nly collateral agreements *that also provide for the management of all or part of a gaming operation are void without NIGC approval.*" *Machal, Inc. v. Jena Band of Choctaw Indians*, 387 F. Supp. 2d 659, 666, 667 (W.D. La. 2005) (emphasis added). This approach appears to be supported by Kevin Washburn's article describing the management contract approval process:

> The NIGC does not approve each document that meets the definition of collateral agreement. Indeed, it has no standards to use for approval of such documents. The NIGC routinely approves management contracts while failing to approve documents collateral to that management contract. It does not intend that such agreements are void; it simply means that the NIGC seeks to approve only that document that actually involves management of a gaming operation. The NIGC has authority to approve a collateral agreement only if it also meets the definition of 'management contract,' that is, it provides for the 'management of all or part of a gaming operation.' In short, not all collateral agreements are management agreements. Those that do not meet the definition of 'management contract' are not subject to NIGC review.

-11-

Kevin K. Washburn, *The Mechanics of Indian Gaming Management Contract Approval*, 8 Gaming L. Rev. 333, 345 (2004) ("Washburn Article").

In the Court's view, the differing approaches to "collateral agreements" resolve on the distinction between those who want to enter into a management contract and those who do not. In the latter situation (presented by the case at bar), the Court's role is to determine whether a contract that was not approved by the NIGC actually crosses the line and becomes a management contract. To protect themselves, parties will often request a "declination letter" from the NIGC. Washburn Article at 345 ("Upon request, the NIGC will review a contract and issue a letter indicating that the contract is not subject to the management contract review and approval process"). When the parties do want to enter into a management contract, they actively seek compliance with the corresponding regulations to garner NIGC approval. In this context, even though the NIGC does not approve truly "collateral agreements," for policy reasons it still examines all of the relevant transaction documents to determine which agreements are management contracts (and which agreements are not). This is why the NIGC adopted an expansive definition of "collateral agreement." Washburn Article at 346 (NIGC created a "broad definition of the term 'collateral agreement' to insure that it can review all the documents needed for meaningful management contract review").

When viewed in this light, it is apparent that Wells Fargo's attempt to save the Bonds must fail. Ultimately, the Court's ruling that the Trust Indenture is a management contract means that the entire transaction was subject to the management contract approval process.

Accordingly, the parties would have been expected to submit all of the related (i.e., "collateral") agreements to the NIGC for approval. This does not mean that all of those agreements are management contracts. But it does mean that the failure to procure NIGC approval in the first instance renders all of the collateral agreements void *ab initio*. Indeed, if the parties in this case did seek a declination letter, it is hard to imagine the NIGC artificially dividing the transaction in the manner suggested by Wells Fargo.[5]

Even apart from the foregoing discussion, Wells Fargo's attempt to separate the Bonds from the Trust Indenture is not persuasive. Indeed, as in most transactions of this nature, it is hard to imagine the Bonds existing without the Trust Indenture. Like the relationship between a note and a mortgage, the Bonds represent the Corporation's obligation to repay its debt, while the Trust Indenture provides security for the transaction. The general rule in Wisconsin (and most jurisdictions) is that "instruments executed at the same time between the same contracting parties in course of the same transaction will be construed together. One application of this rule is the construction together of a mortgage and the note for which it was given as security." *Wipfli v. Bever*, 155 N.W.2d 71, 72-73 (Wis. 1967). Construed together, the Bonds and the Trust Indenture reflect the parties' intention to allow the Trustee to exert managerial control in the event the Corporation defaults on the Bonds. For this purpose, they cannot be separated.

---

[5] For example, in *Casino Magic*, the Tribe submitted all of the related agreements to the NIGC. "After careful review, we have determined that the Consulting Agreement and related documents, *when considered as a whole*, are management contracts. As such, *the submitted documents require the approval of the Chariman of the NIGC*." 293 F.3d at 423 (emphases added). Similarly, in *Match-E-B-Nash-She-Wish Band of Pottawatomi Indians*, the NIGC issued a declination letter which concluded that the agreement "is collateral to a management contract *and must be reviewed in conjunction with the Management Agreement*." 249 F. Supp. 2d at 906 (emphasis added).

Moreover, the Bonds incorporate the terms of the Trust Indenture by reference.[6] 11 *Williston on Contracts* § 30:25 (4th Ed. 1999) ("Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument"). The Bonds explicitly reference "the Indenture and the Bond Resolution . . . for a description and limitation of the property, revenues and funds pledged and appropriated to the payment of the Bonds, the nature and extent of the security thereby created, *the rights of the owners of the Bonds, the rights, duties and immunities of the Trustee*, and the rights, immunities and obligations of the Corporation thereunder." D. 50, Exhibit B at 3 (emphasis added). The Bonds further provide that in case "*an event of default as defined in the Indenture occurs*, . . . no owner of any Bond shall have any right to enforce the provisions of the Indenture, *except as provided therein*." *Id.* at 4 (emphasis added). The Bonds essentially provide for the "management of all or part of a gaming operation" in the event of default by explicitly referencing the Trust Indenture.

The remaining claims in the amended complaint (Counts VI-XIV) lie in tort and equity, not contract. Outside of the Bonds and the Trust Indenture, Wells Fargo relies upon the other transaction documents to establish that the Corporation waived its sovereign

---

[6] It is true that collateral agreements in a mortgage securing a negotiable note will not be imported into the note so as to render it non-negotiable. *Wipfli* at 73 n.2; *Brest v. Maenet Realty Co.*, 15 N.W.2d 798, 800 (Wis. 1944) (citing *Thorp v. Mindeman*, 101 N.W. 417 (1904)). However, the negotiability of the Bonds is not at issue. Instead, the issue is the intent of the parties expressed by the transaction documents.

-14-

immunity with respect to these additional claims.[7] The waiver provisions in these documents were generated in connection with the bond transaction, and they presuppose the validity of the same. To the extent that these waivers can be considered enforceable against the Corporation, they are collateral agreements to the bond transaction and are void for the reasons previously articulated. Additionally, these documents represent the parties' negotiations and were a precursor to the issuance of the Bonds and the execution of the Trust Indenture. Accordingly, the purported waivers are void because they are merged therein. "It is presumed that after the parties negotiate the terms of a contract the negotiations are merged therein when written and signed." *St. Norbert Coll. Found., Inc. v. McCormick*, 260 N.W.2d 776, 780 (Wis. 1978).

## IV. Conclusion

Aside from dismissing this case without leave to amend, there was no error of law in the initial proceedings. The proposed amendments are futile.

---

[7] The Bond Resolution, the Limited Offering Memorandum, the Closing Certificate, and the opinion letters from Corporation counsel all indicate the Corporation's willingness to waive its sovereign immunity with respect to the underlying bond transaction.

**IT IS HEREBY ORDERED THAT**:

1. Wells Fargo's motion to vacate the judgment [D. 49] is **DENIED**; and

2. Wells Fargo's motion to for leave to file an amended complaint [D. 50] is **DENIED**.

Dated at Milwaukee, Wisconsin, this 22nd day of April, 2010.

                                      **SO ORDERED,**

                                      *s/ Rudolph T. Randa*
                                      **HON. RUDOLPH T. RANDA**
                                      **U.S. District Judge**